William G. ANKROM, Plaintiff,

v.

The COMMONWEALTH OF PENNSYLVANIA, et al., Defendants.

Civ. A. No. 79–336.

United States District Court, W.D. Pennsylvania.

Dec. 28, 1984.

James Hecht, Pittsburgh, Pa., for plaintiff.

Joseph L. McCann, Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION

ROSENBERG, District Judge.

This action was brought by the plaintiff, William G. Ankrom, against the defendants, The Commonwealth of Pennsylvania; Richard L. Thornburg, Governor; and the Department of Community Affairs of the Commonwealth of Pennsylvania, Shirley M. Dennis, Secretary, for damages and reinstatement to employment. It is based upon Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq.

The plaintiff had been employed in the Department of Community Affairs of the Commonwealth as a technical level employee. His duties were such as required him to travel to the various cities for the purpose of checking and ascertaining the needs of the community in regard to the program for which the defendant was responsible. He was employed on November 4, 1974. He asserts that he was dismissed by reason of the fact that his superior officer was a black man and that he was prejudiced against him, a white man, personally, and further, because it had been the policy of the Commonwealth to further the occupational positions of the black people as against the white.

The plaintiff charges that Theodore Paige, the immediate black superior, did not like him and was prejudiced against him and that he had in every way attempted to find fault with the plaintiff, and that eventually he caused his dismissal. The plaintiff also charges that the motive for Paige's communications with the plaintiff's wife was to get him out of Harrisburg; and that when the plaintiff was dismissed, the Commonwealth retained three black employees to fill his position.

He further charges that the Affirmative Action Committee was overdone, and that the affirmative action was in aid of the blacks and against the whites. He stated that Paige was harassing his wife by calling her by phone in Pittsburgh where she resided, in trying to get the plaintiff to move back to Pittsburgh.

The plaintiff presented a great deal of statistical evidence, none of which was persuasive in view of all the evidence and authority as a whole which were presented. Counsel for the plaintiff also exerted a great deal of effort in enumerating each of the many exhibits and presenting his own conclusions, in an effort to show accumulated prejudice by the Commonwealth and by Paige. The difficulty with the plaintiff's attempt at persuasion is that I cannot find the same conclusions to each of the exhibits as they were presented by the plaintiff, nor can I disregard the fact that the main object of the action was not supported by the evidence itself, and on the whole, that the plaintiff a white man was discriminated by one black man and the State government officials, topped by the Governor.

After a trial to the court, and from the evidence in the case, I find that the plaintiff was in a department in which both black and white people intermixed in the performance of their functions. The immediate superior of the plaintiff was Theodore Paige, a black man. His two superiors were Michael Fried, Director and Albert Hydeman, Executive Deputy Secretary, white officials. They had ultimate powers to the point of dismissals.

I do find that the plaintiff had begun to drink to a noticeable extent but it is not indicated when he commenced to drink intoxicating liquors during the time of his

employment. I find that the plaintiff's performance was justifiably criticized on two occasions; in February, 1976 when the plaintiff's disruptive and inappropriate behavior adversely affected negotiations with the United States Department of Labor; and in September, 1976 through an improper correspondence with the same department. (This criticism of the plaintiff from Fried, a white male).

The drinking problem of Ankrom became so bad that he was recommended to obtain Alcoholic Annonymous (AA) treatment by his superiors. Paige was instrumental in his being accepted for such treatment in the Gateway Rehabilitation Center in Beaver County in November, 1976. However, the plaintiff was not cured, and by his own admissions in evidence he continued to drink intoxicating liquor, after returning from the AA treatment. On one occasion he and a drinking companion had consumed a fifth of vodka over a short period of time. The obviousness of his drinking was noticeable and he was encouraged constantly to conquer the habit by Community Affairs employees, Dennis Farley and Karl Smith, but without avail.

On October 8, 1976, Ankrom failed to report for an assignment at the Greater Erie Community Action Agency in Erie, Pennsylvania, without informing his supervisors until well after the time for the appointment. At this time Paige ordered the plaintiff to take a day of leave without pay, and based on the facts in evidence, this treatment of Ankrom was not unduly harsh or prejudicial.

Despite the allegations of prejudice by Paige, the evidence reflects that Paige attempted to assign the plaintiff to conduct audits in Western Pennsylvania where Ankrom could see his wife and family more often, and with the intention of thereby decreasing the plaintiff's disposition to drink alcohol.

After reviewing all of the testimony from the numerous employees of the Department of Community Affairs, I find it highly significant that no other employee perceived Paige acting in a prejudicial manner toward Ankrom or any other white individual. Paige was a credible witness, and I believe he was sincerely attempting to help Ankrom overcome his drinking problem, and the effect that drinking was having on his job performance.

On another occasion, when he was instructed to go to Allentown for the purpose of performing his duties, he failed to do so. There is evidence that he had been drinking at the YMCA in his room with one other individual. This was ascertained by Paige and Adonis J. Flute, a white male employee of the Bureau, who went to the YMCA to see the plaintiff. When they went to his room, he was not there. They did see an empty liquor bottle in the wastebasket. They found him in the restroom and talked to him about his not being in Allentown. He made the excuse that he could not go because he did not have a State automobile. He seemed at that time to be affected by alcohol. They told him to clean himself up and come into the office. When he came into the office, he was given an opportunity to explain his failure to make the Allentown meeting and was suspended. Thereupon, the plaintiff returned to his office and immediately began tearing up certain papers for the Migrant Workers' program. After questioning Diane Dubovsky and Eldred Lowman, staff members of the Migrant Workers' program, Fried learned that the work papers had been torn up and after consulting with Hydeman, the plaintiff was dismissed for insubordination particularly in destroying what they concluded were important records.

The Supreme Court has set forth the procedure to be followed in this class of cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973):

> "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii)

that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications."

While the plaintiff was allowed wide latitude in presenting his case and in proposing the various components for the purpose of amalgomating them, all the evidence as a whole does not support his contentions. This action was originally started as a class action; but after I originally examined all the pleadings as filed, I could not find a basis or reason enough to certify this as a class action. After trial, the evidence as a whole bears out the correctness of my finding because there was no concerted action against white persons as a class, while the plaintiff simply attempted to show but only to infer that discrimination was aimed by one black man and the Commonwealth of Pennsylvania against the plaintiff, a white man.

The evidence shows and I so find that the white and black employees in the Department of Affairs worked amicably together, and that no one discerned any prejudice by the defendants against the plaintiff.

I am well aware of the fact that with the decisions of the United States Supreme Court that black people had early and long ago been discriminated against. Thus, there was an effort on the part of the Supreme Court (without any necessity on my part to cite these cases) to re-establish the equality of persons and workers in employment, irrespective of race, color, creed or sex.

The Supreme Court set a pendulum moving in the direction of black persons to right wrongs and to bring them into a status quo with white persons. Under these circumstances, the pendulum swung in favor of black persons. Legislators, courts, federal, district and appellate, then made findings with leanings towards correcting discrimination against black persons in order to give them equality status.

It is obvious that the Commonwealth by its Affirmative Action Plan made an effort to repair its lack of equality in past hirings. Yet there is no evidence in this case that affirmative action was prejudicial in any way to white persons. Thus, while some statistics are quoted by the plaintiff for the purpose of showing preferences for hiring black people, there are not similar statistics with regard to dismissals in the Commonwealth. The plaintiff here attempts to apply the same principles to dismissals as to hirings, only, as they may here have been enumerated in these cases.

The difficulty with this contention is that the plaintiff was not innocent of any action which could cause his dismissal and no authority is cited for this class of dismissals. I find the plaintiff was an alcoholic. He did not abate his drinking habit. He permitted it to interfere with his functions as an employee so that any dismissal which occurred, occurred directly because of the actions of the plaintiff, himself, and not because of Paige, or what Paige might have said or done.

So, too, it is uncontradicted that white supervisors, who were responsible for the plaintiff's continuance as an employee, were the direct source of his dismissal, and it was not the prejudice of a black man, Paige. The plaintiff's case falls on that count under the law.

Also, it must be remembered as I find from all the evidence in the case as a whole, that there was no friction or discrimination between any black and white employees in the Department, and particularly none with Paige. Thus, I am not persuaded by the plaintiff's statements that Paige had discriminated against him. Rather I find that Paige attempted to help the plaintiff, particularly with his drinking habit, and that it was of no avail in trying to help him do so.

It is difficult to believe that any man who would submit himself to AA treatment and thereafter consume as large a quantity of liquor as he admitted doing, had conquered his drinking habit and discontinued drinking alcohol. The plaintiff has not persuaded me that he even tried to refrain from drinking. The admission therefore is evidence contributing to the reasons presented by the defendants on the whole for his dismissal by white superiors in that

dismissal was caused by him, himself, and not by a black man, Paige.

The plaintiff raises another objection that he had not been given sufficient time to answer the charges for his dismissal. While civil service rules did not apply and while there was no formal writing by which he was dismissed, it is evident that he was given an opportunity to comply and plenty of time to conform after the many warnings he had received, and especially after the suspension he had received. His conduct thereafter showed his disdain for his employment when he went into the office and tore up papers and records. His answer was that he was not drunk and that the papers he tore up and threw away were matters of his personal concern. This is not persuasive in view of the fact that he tore up State records belonging to his employers. He did not show that there was any need for him to tear up the records without explaining to his co-workers, after he was suspended. I do not accept the plaintiff's testimony as being credible.

■ Pursuant to *McDonnell Douglas*, *supra*, at page 802, 93 S.Ct. at page 1824, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reasons for the employee's rejection. The Supreme Court indicates that there are many details "which could be recognized as a reasonable basis for a refusal to hire". In this case it was the claimant's participation in unlawful conduct against the employer as a cause for his rejection. The Court said, "that this suffices to discharge petitioner's burden of proof at this stage and to meet respondent's prima facie case of discrimination."

The court further stated "Nothing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate unlawful activity against it." Further, "Respondent admittedly had taken part in a carefully planned 'stall-in', designed to tie up access and egress from petitioner's plant at a peak traffic hour".

The Court went on to say that even so where the employee's reason for rejection suffices to meet the prima facies case, it does not end there. "Title VII does not, without more, compel rehiring of respondent, neither does it permit petitioner to use respondent's conduct as a pretext for the sort of discrimination prohibited by § 703(a)(1) ... Especially relevant to such a showing would be evidence that white employees involved in acts against petitioner of comparable seriousness to the 'stall-in' were nevertheless retained or rehired. Petitioner [employer] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races." (page 804, 93 S.Ct. page 1825)

In *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978) the *McDonnell Douglas case*, *supra*, was re-affirmed by the Supreme Court. The Court said "The central focus of the inquiry in a case such as this is always whether the employer is treating 'some people less favorable than others because of their race, color, religion, sex, or national origin.' *Teamsters v. United States*, supra [431 U.S. 324], at 335, n. 15 [97 S.Ct. 1843, 1854 n. 15]." (at page 577, 98 S.Ct. at page 2949).

The Court explains that the formula enunciated in *McDonnell Douglas* was merely "a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." (at page 577, 98 S.Ct. at page 2949). The Court further states, "the employer must be allowed some latitude to introduce evidence which bears on his motive. Proof that the work force was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant on the issue of intent when that issue is yet to be decided." (at page 580, 98 S.Ct. at page 2951). The Court then said, "such proof neither was nor could have been sufficient to *conclusively* demonstrate that Furnco's actions were not discriminatorily motivated, the District Court was entitled to *consider* the racial mix of the work force when trying to make the determination as to motivation." (at page 580, 98 S.Ct. at page 2951).

The Supreme Court again re-emphasized its formula, stated in *McDonnell Douglas, supra,* in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), as set forth in the syllabus under (a) (page 248, 101 S.Ct. at page 1089):

> "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Id. at 802. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. The defendant need not persuade the court that it was actually motivated by the proffered reasons, but it it sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection."

After identifying and considering the reasons by the Commonwealth for the dismissal of Ankrom, I then considered the statistical evidence offered. I find that the defendant's expert witness, Dr. Neil H. Timm, was more credible than the expert testimony of Chauncey W. Smith for the plaintiff. In examining the statistical information, it does not appear that white males were adversely impacted by the employment practices of the Department of Community Affairs between 1973 and 1979.

Finally, the plaintiff's contention that the Department of Community Affairs hired three black employees into the same job held by Ankrom. The evidence establishes that Diane Dubovsky, a white female, assumed the position and duties of the plaintiff. Timothy Warfield, a black male, did not assume Ankrom's position and he had already been hired before the events leading to the plaintiff's dismissal for insubordination.

## SUMMARY

■ In the case before me, the plaintiff charged that a black man was instrumental in having him dismissed because he was white, and that the Commonwealth of Pennsylvania was prejudiced by its imbalance of employment of blacks as against whites. None of the charges were proved by a preponderance of the evidence. The defendants responded by an uncontradicted showing that all employees, black and white, were treated equally, and that the immediate superior of the plaintiff indeed attempted to help the plaintiff with his habit of alcoholism. The plaintiff continued the habit even though he had submitted himself to AA treatment, and when he was admonished for failure to perform because of his drinking habit, he was suspended by white supervisors from employment. But after being suspended, he showed his scorn by tearing up what was stated to be important public records. The plaintiff actually presented no rebuttal to counteract the preponderance of the evidence presented by the defendants, but relied on his unconvincing case in chief.

Wherefore the plaintiff's claim must fall for failure to produce credible supports to substantiate his claim, and submitting much inferential evidence which presented no persuasion in support of his claim or even presenting a prima facie case, clear of no self-condemnitory proof. Having so failed, judgment must be entered for the defendants.

Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure 52.[1]

---

1. Rule 52. Findings by the Court
   (a) Effect. In all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately the conclusions of law thereon, ... If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.